**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Nancy HICKS, Defendant-Appellant.**

No. 85–5291.

United States Court of Appeals,
Eleventh Circuit.

Sept. 3, 1986.

Michael D. Gelety, Ft. Lauderdale, Fla., for defendant-appellant.

Leon Kellner, U.S. Atty., Robert Bondi, David O. Leiwant, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before HILL and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

HILL, Circuit Judge:

Appellant appeals her conviction of cocaine-related offenses on three grounds: (1) that her jailhouse statements were elicited in violation of the Sixth Amendment; (2) denial of her right to a speedy trial; and (3) improper admission of extrinsic offense evidence.

### FACTS

Appellant and her former co-defendant were stopped by a customs patrol boat several miles south of Miami Beach on October 28, 1981. The customs officers searched the ship and seized approximately five pounds of cocaine along with appellant's diary. Upon arrest, appellant was advised of her *Miranda* rights; she indicated that she wanted an attorney and wished to remain silent. After arrest and processing, appellant was sent to the Dade County Women's Annex where she encountered Marolyn West Armstrong ("West"). West was also in federal custody having surrendered herself on a parole violation matter stemming from prior unrelated federal convictions. The two women had been introduced to each other in Bimini, earlier in 1981, by a man named Tony Stewart. They first spoke to each other in the holding cell and continued to converse after transfer to the Women's Annex where ap-

pellant made a "jailhouse confession" to West.

Appellant's attorney learned of the jailhouse confession shortly before the pretrial hearings and filed a motion to suppress. The magistrate ordered the government to disclose the identity of the informant. The government dismissed the indictment in January, 1982, in lieu of revealing West's identity, and reindicted appellant on the same charges in December, 1983.

## I.

■ Appellant claims that West's testimony regarding her jailhouse statements should have been excluded because they were elicited in violation of her sixth amendment right to counsel. A defendant's right to exclude confessions elicited by government informants in the absence of counsel, once the right to counsel has attached and been asserted, is governed by *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), and *Maine v. Moulton*, — U.S. —, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). In *Massiah*, the seminal case in this area, the Supreme Court held that the sixth amendment right to counsel applies to "extrajudicial settings" and "that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206, 84 S.Ct. at 1203. In *Henry*, the Court found that when the government instructs a fellow inmate to listen for damaging statements made by an accused in custody, it violates the accused's sixth amendment right to counsel by intentionally creating a situation likely to induce the accused to make incriminating statements without the assistance of counsel. *Henry*, 447 U.S. at 274, 100 S.Ct. at 2188–89.

The Supreme Court recently addressed this issue in *Maine v. Moulton*, — U.S. —, 106 S.Ct. 477, 488, 88 L.Ed.2d 481 (1985), where the Court affirmed the suppression of taped conversations between the defendant and his former codefendant, who was cooperating with the police. After summarizing the principal right to counsel decisions, particularly *Massiah* and *Henry*, the Court explained the nature of the right recognized in those cases:

The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State.... [T]his guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. See *Henry*, 447 U.S., at 276, 100 S.Ct., at 2189 (POWELL, J., concurring). However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Moulton*, 106 S.Ct. at 487 (footnote omitted).

This case does not involve either intentional creation or knowing exploitation of an opportunity to confront appellant without her counsel. Instead, the government fortuitously received appellant's statements. The following testimony regarding West's status was given at various pre-trial hearings or at trial: West had been working as a government informant beginning

in late 1979 or early 1980. At the time she went into federal custody, West was working on an investigation involving, *inter alia*, her employer Aviation Activities, Inc., George Morales and Tony Stewart. Nevertheless, West was not deliberately planted in custody to obtain information about any person nor was she instructed to gather information while in custody. Moreover, the government did not knowingly exploit her presence in jail; West did not contact agent Francar, with whom she was cooperating on the Morales/Aviation Activities investigation, until several days after her conversation with appellant, and agent De-Gaglia, who was investigating appellant's case, did not learn of appellant's statement until some time later.

Appellant claims that West was, for all practical purposes, an "informant at large" as in *United States v. Sampol*, 636 F.2d 621 (D.C.Cir.1980). Although West volunteered information on cases unrelated to her role in the Morales/Aviation Activities investigation, *Sampol* presented a much different situation than the present case. In *Sampol*, the informant's sentence—prison or probation—depended solely upon the quality and quantity of information he gave to the prosecutor. With such compelling motivation, he was only too eager to be "accepted by the government as an informant at large whose reports about any criminal activity would be gratefully received" and "'go all out' and 'forge ahead on [his] own' in pursuit of the reward posted by the judge with the approval of the government." *Id.* at 638. In contrast, the government did not ask West to gather information while in custody nor did any government agent pay or promise her anything for providing information. West testified that she was motivated by strong feelings about narcotics due to some family members' substance abuse problems. This self-initiated "crusade" against drug trafficking did not transform West into an informant at large. *See, e.g., United States v. Van Scoy*, 654 F.2d 257, 260–61

(3d Cir.), *cert. denied*, 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981).

The most recent Supreme Court decision in this line, *Kuhlmann v. Wilson*, —— U.S. ——, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), in which the Supreme Court found no *Massiah* violation because the informant was "merely listening," differs from this case. In *Kuhlmann*, the government deliberately placed the informant in a cell with the accused to listen for the desired information. It is clear in this case that the government did not deliberately place West in detention with appellant. In fact, the government agents were not even aware that West was in custody until after her conversation with appellant. Nevertheless, *Kuhlmann* supports our holding in this case. The Court clearly stated that:

the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. [A] defendant does not make out a violation of [the right to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id.*, 106 S.Ct. at 2630.

By "luck or happenstance," appellant was incarcerated with a casual acquaintance who, of her own volition, reported appellant's incriminating statement to the government. The admission of this statement did not violate appellant's sixth amendment rights.

## II.

■ Next, appellant argues that the trial court should have dismissed her second indictment for constitutional speedy trial and due process violations because, although she was arrested on October 28, 1981, she was not tried until December 12, 1984.[1] Appellant was not, however, under

1. In her motion to dismiss, appellant included a

claim under the Speedy Trial Act, 18 U.S.C.

indictment during the entire two year period. She was originally indicted on November 12, 1981; this indictment was dismissed on January 25, 1982. Appellant was reindicted on the same charges on December 15, 1983 and tried on December 12, 1984.[2] The sixth amendment right to a speedy trial does not apply when the government, acting in good faith, voluntarily dismisses the charges.[3] Instead, delay between dismissal of the earlier charges and subsequent arrest or indictment must be scrutinized under the due process clause. *United States v. MacDonald*, 456 U.S. 1, 7, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982). "To succeed in a due process claim the defendant must show (1) that substantial prejudice resulted because of the government's delay and (2) that the prosecution intentionally employed the delay to obtain a tactical advantage." *United States v. Sanchez*, 722 F.2d 1501, 1509 (11th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). *See also United States v. Robinson*, 767 F.2d 765, 768 (11th Cir.1985) (defendant must "show that preindictment delay caused actual prejudice to his defense and was a deliberate action by the government designed to gain a tactical advantage.")

■ Appellant claims she was prejudiced because the government intentionally used the delay to secure an indictment against Tony Stewart in the Morales/Aviation Activities investigation and eliminate him as a defense witness. At the hearing on appellant's motion to dismiss, appellant's attorney proffered the following: Tony Street was expected to testify that he lived in Bimini and had been in contact with Tony Stewart who was a fugitive and refused to come to this country to testify for appellant. (SR1–34). Appellant's counsel then claimed that if Tony Stewart were available, he would refute West's testimony that appellant told her Tony Stewart put the cocaine on the boat.[4] The district court refused to dismiss the indictment, finding there was nothing in the record to indicate that Tony Stewart would have appeared or testified as appellant suggested and that there was no basis to conclude the government was aware that appellant would call Stewart as a witness. (SR1–35–39). We also conclude that appellant's unsupported allegations do not demonstrate any prejudice to her defense as a result of the delay between indictments.

### III.

■ Finally, appellant argues that the district court erred in admitting testimony regarding entries in appellant's diary which was seized on the boat. A Drug Enforcement violation. There are four factors to be considered in a speedy trial claim: length of delay, the reason for the delay, the defendant's assertion of her right and prejudice to the defendant resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). For the reasons discussed in connection with her due process claim, appellant's claim would also fail under this test due to her failure to show any prejudice. Moreover, the record demonstrates that the reason for the delay was to protect the Morales/Aviation Activities investigation, not to hamper appellant's defense. Such a reason is weighed "less heavily" against the government in considering speedy trial claims. *Id.* at 531, 92 S.Ct. at 2192.

§ 3161 *et seq.* She does not, however, raise this claim on appeal.

2. Although appellant's speedy trial and due process claims refer broadly to the three year delay between her arrest on October 28, 1981 and her trial on December 12, 1984, her arguments are directed solely at the delay between dismissal of the first indictment and her subsequent reindictment on the same grounds. On appeal, appellant does not specifically claim that the delay between reindictment in December, 1983 and her trial violated her constitutional speedy trial or due process rights. This delay, almost entirely the result of appellant's pending motions to suppress and motion to dismiss, would not violate her constitutional speedy trial right. *See Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

3. Even if we agreed with appellant's claim that the government acted in bad faith in dismissing her indictment to avoid revealing West's identity and to eliminate Tony Stewart as a defense witness, she has failed to show a sixth amend-

4. In fact, at trial, West did not testify that appellant told her Tony Stewart had put the cocaine on the boat, but rather that he "had brought some stuff down to go on the boat." (SR3–171–72).

ment Administration agent testified that various diary notations from July 6, 1981 through August 10, 1981, reflected drug transactions involving small quantities of cocaine.[5] Appellant contends that this extrinsic offense evidence was inadmissible under Fed.R.Evid. 404(b) because the transactions were too remote in time, the amounts were significantly smaller than in the charged offenses and the diary entries mentioned individuals not implicated in the charged offenses.

A trial court has broad discretion in determining the admissibility of evidence; its ruling will not be disturbed on appeal absent an abuse of discretion. *See, e.g., United States v. Williford*, 764 F.2d 1493, 1497 (11th Cir.1985). The admissibility of extrinsic offense evidence under Fed.R. Evid. 404(b) requires application of a two-part test: "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

The government claims that the diary entry testimony was relevant to the issue of intent. Where the extrinsic offense is offered to prove intent, its relevance is determined by comparing the defendant's state of mind in perpetrating both the extrinsic and charged offenses. *Beechum*, 582 F.2d at 911. The diary entries show that appellant was dealing in street level amounts of cocaine. The DEA agent testified, as an expert, that a person involved in kilogram drug deals can and does deal in small quantities. Although the amounts noted in the diary entries were substantially smaller than the quantity of cocaine appellant was charged with importing, the extrinsic and charged offenses show a similar willingness to traffic in cocaine. *See,*

*e.g., Williford*, 764 F.2d at 1498. We thus find the extrinsic offense evidence was relevant to the issue of intent.

As to the second part of the test, probative value is measured by the overall similarity of the extrinsic and charged offenses, but the elements of the offenses need not be equivalent. *Beechum*, 582 F.2d at 915. Instead, the court must make a common sense assessment. *Id.* at 914.

> Whether the extrinsic offense is sufficiently similar in its physical elements so that its probative value is not substantially outweighed by its undue prejudice is a matter within the sound discretion of the trial judge. The judge should also consider how much time separates the extrinsic and charged offenses: temporal remoteness depreciates the probity of the extrinsic offense.

*Id.* at 915. The extrinsic offense testimony showed that appellant engaged in street-level cocaine transactions approximately three-to-four months before her arrest for importing five pounds of cocaine. As discussed above, the extrinsic offenses were very similar to the charged offenses in their overall purpose—trafficking in cocaine. In light of this similarity, four months' time difference does not reduce the probative value of the extrinsic offense evidence. *See, e.g., United States v. Terebecki*, 692 F.2d 1345, 1349 (11th Cir.1982).

Finally, appellant claims that the prejudicial effect of the extrinsic offense evidence outweighed the probative value because the government did not need it to prove its case. The strength of the government's case on the issue of intent is an important factor in comparing probative value and prejudicial effect. The greater the government's need for evidence of intent, the more likely that the probative value will outweigh any possible prejudice. *United States v. Russo*, 717 F.2d 545, 552 (11th Cir.1983). Appellant's intent was clearly at issue in this case. Here, the government did not have overwhelming evidence of appellant's intent, only circum-

---

5. Appellant does not contend that the diary entry testimony was inaccurate or insufficient for the jury to find that she committed the extrinsic offenses.

stantial evidence linking appellant to the cocaine and West's testimony, which the jury may have disbelieved in light of her criminal history. On the other side, the extrinsic offenses were not so heinous that the jury would be likely to convict appellant for the extrinsic offenses rather than the charged ones and the evidence was unlikely to mislead or confuse the duty. *See e.g., Beechum,* 582 F.2d at 914. Thus, the probative value was not substantially outweighed by prejudicial effect.

We therefore find the district court did not abuse its discretion in admitting the extrinsic offense evidence.

For the reasons stated above we affirm appellant's conviction.

AFFIRMED.